**David Jacquot**
**2041 Bandy Road**
**Priest River, ID 83856**
(208) 415-0777
FAX: (208) 263-6274

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Case # 08CR1171-W |
| | ) | |
| Plaintiff | ) | STATEMENT OF FACTS FOR |
| | ) | PRETRIAL MOTIONS |
| VS. | ) | |
| | ) | Judge: Hon. Thomas J. Whelan |
| | ) | Courtroom: 7 |
| **DAVID C. JACQUOT** | ) | Date: Sept 8, 2008 |
| | ) | Time: 2:00 pm |
| **Defendant** | ) | |

1  Now comes the Defendant and describes information in support of the Pre-trial motions in this
2  case. This case has a long and complex history. The government will likely attempt to tell the
3  Court that this history is irrelevant. However, the case history is very relevant to the
4  government's pattern of illegal and bad faith actions that have been present throughout the case
5  and continue to this date. The Defendant contends that any government argument that the case
6  history is irrelevant is merely an attempt by the government to bury the history of this case in
7  order to hide the government's errors and abuses. Moreover, the government included a
8  separate paragraph in the indictment that states that the Defendant was the Vice-President and
9  General Counsel for xelan during the periods in question. Although this statement is factually
10 incorrect, it does show that the government considers the case history to be important and likely
11 presented matters related to the case history to the Grand Jury in seeking the indictment. Since
12 the xelan relationship and case history were important enough to be included in the indictment,

1 any argument by the government that the case history is now irrelevant at this point should be
2 ignored as nothing more than a continued attempt to cover-up its abusive and illegal behavior
3 in this case.

4 1. The Defendant, through the Professional Corporation of David Jacquot, JD, LLM (Tax),
5     PA ("LAWFIRM") was engaged in October 1998 to provide legal services to xelan, Inc.,
6     and affiliated companies. xelan, Inc., provided financial planning, investment and
7     insurance services to physician and dentist clients throughout the United States via offices
8     independently owned by licensed securities and insurance agents. The legal services
9     provided by LAWFIRM to xelan were initially provided from the Defendant's offices in
10    Idaho, with occasional travel to San Diego, where xelan Headquarters were located. In an
11    abundance of caution, to avoid allegations of unauthorized practice of law during these
12    occasional trips to California, the Defendant was made a Vice President of xelan, Inc. The
13    Defendant took and passed the California Bar and resigned as a Vice President of xelan,
14    Inc., in April of 2001. In the summer of 2001, LAWFIRM relocated its main office to the
15    San Diego area.
16

17 2. During the year 2000, the IRS initiated audits of xelan clients Drs. Cohen and El Shahaway
18    in the Tampa Florida area.
19

20 3. From the time that Defendant engaged with xelan through the 2001 to 2002 timeframe, the
21    Comptroller for the xelan entities was Wendy Hickson who had access to all xelan
22    accounting and reporting systems and supervised all personnel involved in the accounting
23    operation. After leaving the Comptroller job, Ms. Hickson worked for attorney Michael
24    Suverkrubbe and had access to the same computer system that ran the xelan accounting
25    system. Additionally, she often frequented the xelan accounting department. Wendy
26    Hickson was convicted on both state and federal fraud charges in 2005 or 2006 for
27    activities unrelated to xelan or the Defendant. Her boss, attorney Michael Suverkrubbe was
28    also convicted of federal fraud charges in the 2006 timeframe for activities unrelated to
29    xelan or the Defendant.
30

4. In July 2001, audit of the xelan Foundation Inc., (hereinafter the "Foundation") began in San Diego. The Defendant, via the "LAWFIRM" represented the Foundation. At that time, xelan and the Defendant believed that this was a routine audit to verify information for the issuance of the Foundation's permanent exemption status. The Defendant expected such an audit since all charitable foundations receive temporary exemption letter, with the permanent letter coming five (5) years later. The xelan Foundation was formed in 1997, so July 2001 was consistent with such a timeline.

5. However in reality, the audit was a subterfuge for gaining access to the xelan client list. On 22 August 2001, IRS Agents John Wong and Ed Lawson had an appointment at the xelan offices to review the Foundation's computer database and accounting system. Prior to this appointment, Agent Wong requested that he be allowed to have a copy of the database. This request was denied because it would be a violation of federal copyright law to provide a copy of the commercial software and the proprietary programming that was designed to operate the database. Agents Wong and Lawson were given access to a computer to review the data. After a short period of time, they stated that they had the "data they needed" and left the office. Upon review of the computer they had used, a compressed "zip" file of the commercial software, the proprietary programming and the database information was found on the computer. The Defendant contacted Agent Wong regarding this theft and Agent Wong left a voicemail at the offices of LAWFIRM admitting to the theft, and stated that he had spoken to Agent Lawson and they were not going to use the software or data. A tape recording of that voicemail was made and preserved.

6. Shortly thereafter, a large number of Foundation donors received notices from the IRS that they were being audited. During a visit to the Foundation offices to meet with the Foundation's CPA, the Defendant asked Agent Wong if he sent a client list to IRS agents in Florida. Agent Wong responded "no." However when confronted with the fact that it was a very strange coincidence that these audits arose shortly after he took the database, Agent Wong responded that he didn't send a "client list" but that he did send a "donor list" to Florida. When asked who he sent it to, all he would say is that the list was sent to an "abusive trust coordinator." When asked if he thought the Foundation was an "abusive

1  trust" he responded "no." When asked why he would send a list of donors to an abusive
2  trust coordinator when he did not believe the Foundation was an abusive trust, he stated that
3  he was "requested to do so by the abusive trust coordinator." When asked how an abusive
4  trust coordinator would know to ask him for a list, he replied that he "did not know" and
5  abruptly left the Foundation offices.

7. Further evidence that this audit was a subterfuge is shown by the fact that Agent Wong stated that if the Foundation "got any written requests" related to the issuance of a permanent exemption letter, that such correspondence and responses should be provided to him. This seemed very strange, because at that time it was thought Agent Wong was there to work on the permanent exemption letter. The Foundation did later receive a request from the IRS office responsible for exemption determinations in the mail rather than from Agent Wong. It clearly looked like the department of the IRS responsible for exemption determinations was unaware of Agent Wong's activities. Therefore, instead of giving the information to Mr. Wong, the Foundation sent the information to the office requesting it and it was processed and a permanent exemption letter was issued. Obviously, Agent Wong and the IRS were not pleased about this situation.

8. In January of 2002, a meeting was set in the Dr. Cohen and Dr. El Shahaway audits in Florida by IRS agent Rick Starr. This meeting was set by Mr. Starr by simply sending a letter requesting that the doctors and their local xelan representative, Jeffery Davenport, come to his office over a three day period. No summons was issued and the letter contained no description of what the IRS wished to discuss at the meeting. Sensing something was not right, attorney Mike Lloyd (from Pennsylvania) and the Defendant traveled to Florida. Mr. Lloyd represented the doctors and the Defendant represented Mr. Davenport. Mr. Lloyd and Dr. Cohen were scheduled to meet first. They were met by IRS examination agent(s), IRS attorney(s), IRS national coordinator(s) and a court reporter. The IRS questioned Dr. Cohen for over 7 hours on the record. The next day the same thing happened to Dr. El Shahaway. On the third day, moments before the scheduled meeting, the Defendant called Agent Starr and told them that Mr. Davenport would not be showing up. Agent Starr was outraged, and claims that he had people from "all over the country" here for this meeting.

1  The Defendant told Agent Starr that is exactly why Mr. Davenport will not be showing up.
2  The Defendant informed Agent Starr that Mr. Davenport would answer his questions at a
3  later date and requested that he provide LAWFIRM a list of issues so that we could
4  adequately prepare. Agent Starr threatened summons enforcement if Mr. Davenport did not
5  show up immediately. The Defendant informed Agent Starr that he needed to issue a
6  summons before he can seek summons enforcement. Agent Starr was extremely angry and
7  the call terminated. The IRS never followed up on the interview of Mr. Davenport.

9. During the remainder of 2002 through 2004, audits of xelan client doctors whose names were on the list stolen from the Foundation continue to spring up all over the country. During 2002 and 2003 the IRS initiated approximately 200 audits of xelan clients. During this timeframe, the Defendant and attorneys from other law firms exchanged numerous heated conversations and correspondence with IRS personnel and attorneys regarding these audits. These IRS audits become quite contentious at times, especially with regards to discovery issues. These disputes ultimately ended up in litigation in U.S. District Court in several jurisdictions around the country. Even though these issues were being litigated, pursuant to the laws and procedures set forth by Congress in the Internal Revenue Code, the government took the position that xelan was illegally hindering the IRS and later asserted that claim as part of the TRO/receivership filed in this Court and further described in paragraph 15, below. The Defendant coordinated the efforts of other lawyers involved in these audits and litigation and often paid these lawyers with client funds held in the LAWFIRM attorney client trust account. These government falsely alleged that those payments were improper in the Ex Parte Application and supporting affidavits submitted to this Court to get the TRO/ Receivership as further described in paragraph 15, below. Judge Burns did not find that any of the payments were illegal (see paragraph 18, below).

10. In mid 2002, the xelan Foundation filed civil lawsuit was filed against Agent Wong and other IRS agents involved in the theft of computer data and software from the Foundation. The case was filed in California Superior Court in Los Angeles by attorney Darrell Hallett from Seattle and an attorney from the Hochman firm in LA. During the case, Darrell Hallett, the Hochman attorney, and the Defendant receive identical anonymous threat

PAGE 5      STATEMENT OF FACTS      08CR1171-W

1  letters in the mail demanding that they withdraw from representing xelan or suffer harm.
2  These letters were postmarked in Santa Ana California, near the IRS office where Agent
3  Wong worked. Darrell Hallett reported the receipt of the threatening letters to the Attorney
4  General's Office in Seattle by attorney Darrell Hallett and an investigation was initiated.
5  To date, the Defendant has heard no results of this investigation. Shortly thereafter, due in
6  part to these letters, but more so due to a lack of funds to continue to pursue the expensive
7  litigation, xelan dismissed this civil lawsuit.
8
9  11. On the May 1, 2004, LAWFIRM terminated the representation of all xelan companies. The
10     Defendant and the other two attorneys working for LAWFIRM stopped representing xelan
11     on 2 May 2004. Shortly thereafter, the Defendant and LAWFIRM moved back to Idaho.
12
13  12. In June of 2004, the Defendant placed Viatical Liquidity LLC (VLLLC) into Chapter 11
14     bankruptcy in the U.S. Bankruptcy Court for the Southern District of California. The
15     Defendant and a xelan representative named David Cline formed VLLLC in 2002 to
16     administer repayments to investors that had been defrauded via viatical settlement contracts
17     sold by xelan. The Defendant and Mr. Cline formed this settlement company because
18     neither of them were involved in the decision to sell, nor sold, any of the viatical settlement
19     contracts. Mr. Cline has never been involved in the administration of VLLLC. xelan was
20     not involved in the fraud that lead to the failure of the viatical settlement contracts. Rather,
21     xelan was simply the "salesman" of unrelated companies fraudulent product. Even though
22     xelan was not at fault, it was decided that VLLLC should be owned and managed by
23     individuals with no involvement in the cause of the problem. All actions of VLLLC have
24     been under the management of the Defendant. The Defendant served without
25     compensation from inception of VLLLC through the completion of the Chapter 11 in the
26     summer of 2006. Repayment of $42 million dollars over 10 years was the goal of VLLLC.
27     This was being done primarily to get the investors their money back, but also to prevent bad
28     publicity from destroying the xelan companies. Twenty (20%) of **gross revenue** of the
29     xelan companies and all representatives was paid to VLLLC and VLLLC in turn paid the
30     investors. Based on the loss of income that resulted from the government's ill-founded
31     attacks on xelan, audits of xelan clients and surrounding publicity, xelan defaulted on its

1  payment obligation to VLLLC at the beginning of June 04 and VLLLC filed for bankruptcy
2  in San Diego. Extensive records of VLLLC were seized in the raid on 4 November 2004.
3  None have ever been returned and none were provided in discovery even though the
4  government clearly knows that the Defendant is the manager/owner of the company. To
5  date VLLC has collected (from xelan and via litigation) and repaid the investors
6  approximately 40% of their dollars invested. Pursuant to the Chapter 11 plan, a new
7  company, Liquidity Assets, LLC emerged from bankruptcy. The Defendant is currently the
8  sole manager of that company. The prior proceedings in this matter prevented xelan and its
9  independent representatives from being able to return tens of millions of dollars to
10 defrauded investors. Therefore it is the government, and not xelan and the Defendant, that
11 caused citizens to suffer loss. The current proceedings threaten the Defendant's ability to
12 continue to seek recovery for these fraud victims.
13
14 13. In or around July /August 2004, several, but not all, of the xelan related entities filed for
15    Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of California.
16    The xelan companies continued to operate as a debtor-in-possession. A new company
17    named Greenbook Financial Services Inc., ("Greenbook") was formed by former xelan
18    employees (but not former owners) to attempt to buy assets from the xelan bankruptcy
19    estate and thereby continue to provide employment to former xelan employees. The two
20    attorneys that previously worked for LAWFIRM were employed by Greenbook Financial.
21
22 14. In the summer of 2004, two IRS CID agents from San Diego (Weeks and Shrek), visited the
23    Defendant at his home in Priest River, ID. They interviewed the Defendant about xelan
24    matters. The agents did not ask the Defendant a single question about the tax returns filed
25    by LAWFIRM or discuss those returns in any way.
26
27 15. In late October 2004, the San Diego U.S. Attorney's office via AUSA Faith Devine filed an
28    ex parte complaint, temporary restraining order /receivership under seal alleging a $500
29    million ponzi scheme and other erroneous claims. The declaration supporting this action is
30    filled with errors, false statements, and half truths (as disclosed below in paragraph 18).
31    This application for a receivership sought to seize all assets of all xelan related companies,

1 various personnel, and various attorneys, including the Defendant. Based on this false
2 declaration, this Court granted the TRO. Following that, Judge Whelan recused himself
3 and the case was transferred to Judge Larry Burns. **Nowhere in the complaint or in the**
4 **Ex Parte TRO/receivership application or the supporting declarations is there a single**
5 **mention of any problem or issues with individual tax returns for the Defendant,**
6 **LAWFIRM or any other person.**

16. On 4 November 2004, a joint federal task force consisting of at least the IRS, Homeland Security, Immigrations and Customs Enforcement (ICE), and the Postal Inspector raided the xelan offices in San Diego and seized approximately 243 boxes of records containing tens if not hundreds of thousands of documents. Also seized were extensive and computer files, including computer files of the financial affairs of the xelan companies and virtually **all LAWFIRM client and administrative electronic records** . These LAWFIRM records were taken from attorney Silas Harrington, a former employee of LAWFIRM, and were likely also contained in computer back-up files seized from xelan. The files were taken from Mr. Harrington, over his objections, and were on his personal notebook computer and also on a CD-ROM possibly taken from Mr. Harrington. Mr. Harrington was allowed by LAWFIRM to retain these client records to facilitate dealing with potential LAWFIRM client issues questions arose, and in the event that LAWFIRM was re-retained to represent select xelan entities. See Exhibit 1 for a copy of the transmittal letter from AUSA Faith Devine regarding the seizure inventory. This inventory includes, but is not limited to the seizure of:

- xelan accounting records and computer files containing LAWFIRM information and invoices
- All LAWFIRM files on Mr. Harrington's laptop
- Extensive records of Viatical Liquidity, LLC ("VLLLC") (See paragraph 12, above for more information about VLLLC)
- Back-up disks of the xelan computer network containing LAWFIRM files
- General Counsel memorandums written by the Defendant and LAWFIRM
- Various other memos and correspondence of the Defendant and LAWFIRM

- Invoice from LAWFIRM to xelan dated 06/27/02
- Engagement contracts between the Defendant and xelan dated 10/15/98 and 11/01/01
- A file folder labeled "Jacquot"

Mr. Harrington was working for Greenbook at the xelan location preparing information and documentation to support Greenbook's attempted purchase of xelan assets from the bankruptcy estate. After the raid, the civil complaint and receivership is unsealed and served. The government froze all the Defendant's assets and seized his passport. The Defendant's reputation and law practice were severely sullied by the government's aggressive publicity of the raid/TRO/receivership. Based on the coordinated simultaneous search warrant and TRO/receivership actions involving agents from the same offices, the Defendant believes that erroneous/false affidavits similar to those presented to this Court for the TRO/receivership Application were used to obtain the search warrants.

17. In late 2004, the Defendant transferred 29 boxes of files related to xelan and to LAWFIRM to attorney Jim Frush in Seattle. The Defendant personally drove these files to Seattle and delivered them to Mr. Frush's office.

18. In early December 2004, the initial hearing on the TRO is heard before Judge Larry Burns in San Diego. It is case # 04-CV 2184 LAB (AJB). At the hearing, Judge Burns set aside the TRO, denied the government a Preliminary Injunction, dissolved the receivership. He later issued a 12 page opinion that was harsh to the government. His opinion included, but was not limited to, findings that:

- the government's allegations of a "ponzi scheme" are "**without merit,**"
- "**no evidence**" that the Defendant's are dissipating their assets,
- "**no evidence**" that assets are traceable to criminal activity,
- "**the government conceded**" that it can produce "**no evidence**" that the xelan program violated internal revenue statutes or regulations,
- the government's evidence that the xelan programs were not legitimate was "**speculative,**" and

- the government did **not** show that "**the tax implications of any particular xelan product were mischaracterized.**"

In later proceedings, Judge Burns awarded attorney fees to some defendants and ordered the government to pay hundreds of thousands of dollars to the defendant's lawyers. This hearing was argued on behalf of the government by DOJ Stewart Gibson. However, AUSA Faith Devine from San Diego was present at the hearing and filed the declarations in the case. Transcripts of the hearing and Judge Burns opinion, show that the declarations were riddled with falsehoods, errors and essentially only came to a conclusion of "sworn uncertainty" by the IRS experts making the declarations. In regards to the only specific allegation against the Defendant, the agents focused on payments made to the attorneys throughout the country that LAWFIRM had hired and was managing on behalf of clients to deal with audit related litigation, and payments made on behalf of an insurance company client to settle claims made against such client. Somehow, the agents concluded that payment of legal fees and payment in settlement of insurance claims was improper. Moreover, although the government had copies of the entire LAWFIRM attorney trust account, they "conveniently" omit from their declaration that there were dozens of checks for many millions of dollars written to the IRS for the tax liabilities of client(s). In fact, there is no mention of any IRS payments at all. Judge Burns made no findings that any payments by the Defendant were improper or illegal.

19. In regards to the government allegation that xelan was stealing money that belonged to clients, the Temporary Receiver that was appointed in the case reported to Judge Burns that there were no material discrepancies and Judge Burns **specifically found that the government's asset dissipation claim was unfounded**. The Receiver was released from his post.

20. In regards to the government's allegations that the xelan programs were tax fraud, not only did the declaration's "sworn uncertainty" not support such an allegation, history has proven it to be completely false. It is the Defendant's belief and understanding that the IRS has entered into global settlement regarding the xelan programs with the various xelan entities

1   and taxpayers. For example, in regards to the largest program, the Supplemental Insurance
2   Program, the Defendant is informed and believes that a closing agreement was reached in
3   late 2005 that had no findings of criminal fraud, no civil fraud penalties or wrongdoing, and
4   in fact **did not even disallow the approximate $500 million dollars worth of tax**
5   **deductions** taken by over 1,000 xelan clients on their tax returns over many years.
6   Therefore, the alleged tax fraud by the xelan entities presented in the TRO/receivership and
7   the supporting declarations presented to this Court was <u>**found not to exist**</u> in the
8   declarations, by Judge Burns in his opinion, and ultimately by IRS itself in civil audits and
9   global settlements.

11  21. Shortly after Judge Burns threw out the government's TRO/receivership case, the
12      government dismissed its civil complaint.

14  22. Shortly after the government dismissed its civil case, even though the civil case was utterly
15      unsupported by the false and erroneous declarations that AUSA Faith Devine presented to
16      this Court, Ms. Devine indicates to attorney Jim Frush that she is going to continue the
17      criminal investigation on essentially the same allegations of alleged xelan wrongdoings.

19  23. In January 2005, just several weeks after the allegations in the TRO/receivership/civil
20      complaint and supporting declarations are shown to be unfounded, one of the major affiants
21      in the case, Postal Inspector Timothy France sent out a letter to virtually all (or at least a
22      substantial number of) xelan clients informing them that they were victims of violations of
23      federal criminal laws and soliciting them to provide information and participate in the
24      investigation. Not only does this letter leap to conclusions of violations of federal criminal
25      law without a trial, it is packed with leading questions and factual inaccuracies. A copy of
26      this letter is attached as Exhibit 2. No charges were ever brought relating to any of the laws
27      described as broken in this letter, let alone any convictions.

29  24. During the 2005-2006 timeframe, the Defendant's attorney, Mr. Frush changed law firms.
30      His old firm sent the Defendant a release to obtain permission to send the Defendant's
31      records to Mr. Frush's new firm. The Defendant executed this release and the records were

supposedly sent. Later the Defendant went to Mr. Frush's office to review records and develop timelines in relationship to the continued criminal investigation of xelan activities. Upon reviewing the files present in Mr. Frush's new office, the Defendant discovered only about 60% of the boxes were present. Mr. Frush returned to his old firm and located some of the records. He returned to his old firm several times and ultimately all but 4 boxes were found. The defendant reviewed all the materials in all the boxes and believes that some of the material from two of the missing boxes has been placed in other existing boxes. This left two (2) boxes completely missing and possibly some materials from two other boxes missing. One of the boxes missing contains the financial and tax records of LAWFIRM. Extensive search by Mr. Frush has still not turned up these materials.

25. On or about mid-2006, AUSA Faith Devine stated to the Defendant's attorney Jim Frush that they are no longer focusing as much on alleged xelan fraud and stated that she believes that LAWFIRM did not file corporate tax returns in 2000 and 2004, and that the amounts on 2001 through 2003 corporate tax returns were wrong. This is the first time that alleged errors on LAWFIRM corporate tax returns have been raised. These new allegations <u>only</u> <u>occur after</u> :

- The government's Temporary Restraining Order was dismissed,
- The Temporary Receivership was dismissed,
- The request for Preliminary Injunction was denied,
- The IRS's civil case was dismissed,
- The government was required to pay substantial attorney fees to the Defendants in the above actions,
- The government's false and erroneous letter to all xelan clients failed to turn up any victims, and
- Global settlements were entered into by the IRS upholding the deductibility of the alleged fraudulent programs.

AUSA Faith Devine later told Jim Frush that they found the 2004 return that "had not been filed." The numbers they allege that should be on the returns have changed numerous

1  times. Ultimately, the government alleges underreporting for 2001 and 2002. No charges
2  are brought for 2003 and 2004 as according to the government's calculations, more income
3  was declared than they say was earned.

26. Mr. Frush sent a letter to the National Office Tax Division requesting a conference if an indictment was sought. He received a response letter stating that his request had been received and would be honored.

27. Michael Suverkrubbe was a former IRS CID agent in the San Diego office. He had attended law school at night and left the IRS after graduating from law school. (The Defendant is informed and reasonably believes that he may have left the IRS on unfavorable terms due to misconduct.) Mr. Suverkrubbe was hired on behalf of xelan by the Defendant. Mr. Suverkrubbe claimed to be a close friend of Agent Shrek and others in the San Diego CID office and claimed to speak with them often and go to lunch, etc. He claimed he was trying to get information about the civil audits against xelan. However, the Defendant now believes that exactly the opposite was going on. This suspicion is bolstered by at least two incidences that came to light near the end of LAWFIRM's representation of xelan. These are:

- The Defendant learned that Mr. Suverkrubbe had provided confidential attorney client privileged information to a xelan office representative named Darrell Nelson and then arranged a meeting for that representative's wife to file a claim for reward for original information (Form 211) with San Diego CID agents.

- Mr. Suverkrubbe assisted a xelan client in Las Vegas with an unrelated criminal tax charge. This client's name was Dr. Selznick. Dr. Selznick was represented by counsel, but Mr. Suverkrubbe told Dr. Guess (the President of xelan, Inc.) that he could find provide him assistance. Dr. Guess requested that Mr. Suverkrubbe assist his client. Dr. Selznick ended up getting a substantial 5K sentence reduction in the case and it was later determined that this reduction was for recorded calls with Dr. Guess about xelan activities.

Mr. Suverkrubbe, after terminating his representation of xelan was convicted of federal fraud charges in a matter unrelated to xelan or the Defendant. He was tried by AUSA Faith Devine and plead guilty before Judge Thomas Whelan. Whether Mr. Suverkrubbe received any deals for information provided to the government in his case is unknown.

28. In late 2006, AUSA Faith Devine apparently left the San Diego office for an assignment elsewhere. The investigation essentially went dormant.

29. In or around late 2007 timeframe, AUSA Faith Devine returned to San Diego and the case came back to life, with agents interviewing people and grand jury subpoenas being issued. "Conveniently," the Agents previously involved in the investigation of LAWFIRM's tax returns and involved in the prior bad acts in the case are replaced with new agents with no tainted behavior. In March of 2008 AUSA Faith Devine informs Jim Frush that they are going to indict the Defendant. AUSA Faith Devine had requested and received approval from the National Office to proceed and ignored Mr. Frush's request for a conference. Jim Frush inquired why he did not get the requested conference at the National Office. Ultimately, the government conceded that they "accidentally" processed the case and made the decision to indict without granting the conference. The National Office then conducted a telephone call with Mr. Frush and about a week later affirmed their previous decision to indict. The indictment was filed on 15 April 2008.

30. At the arraignment, pre-trial services recommended a $10,000 signature bond for the release of the Defendant. AUSA Faith Devine requested a $35,000 surety bond, even though she also told the Court that she does not believe the Defendant is a flight risk.

31. On or about 15 May 2008, the Defendant requested the assistance of the Federal Public Defender's office in electronic filing of motions in this case and the Federal Public Defender's office set a hearing to be appointed to do so. Several days later, the Federal Public Defender's office informed the Defendant that they were conflicted in the case and could not help the Defendant. At the hearing that was set, AUSA Faith Devine stated to the

Court that Federal Public Defender was definitely conflicted in this case. As the nature of the charges present a very high likelihood that there are no co-defendants in the case and no co-defendants have been indicted, this leads to only two possible explanations:

- The Government, AUSA Faith Devine, and the Public Defender's office view this case as related to all the prior xelan proceedings, thus reinforcing the relevance of the case history, and/or

- There exists a government informant or witness who needs criminal defense counsel with information relevant to the guilt or punishment of the Defendant for the current Indictment.

32. On 21 May 2008 a letter was sent to AUSA Faith Devine requesting that she provide discovery of all items required by Rule 16 and by the <u>Brady</u> line of cases.

33. On 22 May 2008 the government provided the items of discovery shown on Exhibit 3. On that date the Defendant attempted to speak to AUSA Faith Devine about additional discovery. When contacting her via the telephone in the lobby of her office, the Defendant identified himself and started to speak and was rudely cut off and told by AUSA Faith Devine that she was on the phone and that she would call him back. The Defendant waited 30 to 40 minutes and was then told by the office receptionist that AUSA Devine had to leave the office and that she would call him back at a later date. No such call has ever been received.

34. In response to the Defendant's Motion to Continue, AUSA Devine improperly and untimely raised a Motion for the Court to inquire into the Defendant's qualification to represent himself **and his intention to retain counsel**, even though Magistrate Adler, on the record, had made such an inquiry approximately 10 days earlier. Judge Whelan summarily denied the request to re-visit the Defendant's qualifications for self-representation and inquire into his retaining counsel.

35. On 23 May 2008 the Defendant filed a Motion to Continue and a Protective Motion to Compel Discovery (in the event the Motion to Continue was denied). This Protective Motion to Compel Discovery contains a detailed list of items requested.

36. On 9 June 2008 the items of discovery shown on Exhibit 4 were provided.

37. The government has also offered the Defendant the opportunity to copy 4 boxes of bank records. In order to conserve costs, the Defendant plans to copy such items as soon as all discovery is made available. This will allow the Defendant to hire a copy service one time to visit the government offices and to copy such items . AUSA Devine has been informed in writing of such intent.

38. On 4 August 2008, the Defendant sent a letter to Faith Devine requesting that she respond regarding her intentions to provide the requested discovery by marking a box on a chart. This list of items is the same as those requested in the Protective Motion to Compel Discovery filed on 23 May 2008, described in paragraph 35 above. The letter clearly stated that **if a response was not received that a Motion to Compel would be filed deeming the request denied**. A copy of the letter sent to AUSA Devine is attached as Exhibit 5. The portions of that letter relating to settlement discussions has been redacted.

39. On 14 August 2008, Faith Devine responded via email that she has provided all discovery she is legally required to provide, stating:

> *"We believe that we have complied with our discovery obligations pursuant to Federal Rules of Criminal Procedure 16 and our Brady/Giglio obligations",*
> *and*

> *"The Response filed by the government is consistent with local practice in this district and applicable federal criminal law."*

1    She further stated that she will provide all Jenks Act materials and expert witness
2    summaries "at a reasonable time prior to a firm trial date." She also agreed to provide
3    transcripts of recordings made by undercover agents during seminars conducted by xelan.
4
5    **Based on this response, the government denied all other requested discovery.**
6
7    Respectfully Submitted this 25th day of August 2008
8
9
10   David Jacquot